# EXHIBIT

# "G"

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

RAMON LAGOS,                    *
MICHELLE SPARROW, AND           *
CARLA OBASUYI,                  *
Individually                    *
and on behalf of                *
similarly                       *
situated                        * CIVIL ACTION NO.
                                * 4:11-CV-04523
                                *
VS.                             *
                                *
COGENT COMMUNICATIONS,          *
INC.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
CARLA OBASUYI
JUNE 22ND, 2012
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of CARLA OBASUYI, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 22ND of JUNE, 2012, from 2:03 p.m. to 5:03 p.m., before Samantha Downing, CSR, CLR, in and for the State of Texas, reported by machine shorthand, at the offices of SHELLIST, LAZARZ, SLOBIN, 11 GREENWAY PLAZA, SUITE 1515, HOUSTON, TEXAS 77046, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

   Job No: 26014-B

2

1          A P P E A R A N C E S

2
      ATTORNEYS FOR PLAINTIFFS:
3

4          SHELLIST, LAZARZ, SLOBIN, LLP
           11 GREENWAY PLAZA
5          SUITE 1515
           HOUSTON, TEXAS 77046
6          713.621.2277
           By:  MICHELLE HOOGENDAM CASH, ESQ.
7               mcash@eeoc.net
                SIDD RAO, ESQ.
8

9

10
      ATTORNEYS FOR DEFENDANT:
11

12         HAYNES & BOONE, LLP
           ONE HOUSTON CENTER
13         1221 MCKINNEY STREET, SUITE 2100
           HOUSTON, TEXAS  77010
14         713.547.2064
           By:  MATTHEW DEFFEBACH, ESQ.
15              matthew.deffebach@haynesboone.com
                MEGHAAN MCELROY, ESQ.
16              meghaan.mcelroy@haynesboone.com
                JOHN CHANG, ESQ.
17

18

19

20

21
      REPORTED BY:
22

23         MS. SAMANTHA DOWNING, CSR, CLR

24

25

1    A.   Uh-huh.
2    Q.   Today was the first day that you met with
3  them to prepare for the deposition?
4    A.   No, last week.
5         THE VIDEOGRAPHER:  Ma'am, I need you
6  to speak up a little bit.
7         THE WITNESS:  Oh, okay.
8         THE VIDEOGRAPHER:  Thank you.
9    Q.   (BY MS. MCELROY)  Okay.  Did you attend
10 college?
11   A.   Yes.
12   Q.   Okay.  What college?
13   A.   I am from Michigan.  It's Cornerstone
14 University.
15   Q.   Okay.  Did you graduate?
16   A.   Yes, I did.
17   Q.   In what year?
18   A.   '05.
19   Q.   When did you move to Houston?
20   A.   2007.
21   Q.   And when did you start working for Cogent?
22   A.   December of 2009.
23   Q.   And before Cogent, where did you work?
24   A.   Vision Financial.
25   Q.   And what were you doing at Vision

1    Q.  Were you terminated?  Were you fired?
2    A.  Well, I got back from being sick, and they
3  let me go.  So I am not sure what was the actual
4  reason.
5    Q.  No one ever gave you a reason?
6    A.  Not to my understanding, no.
7    Q.  So that's, no, they didn't give you a
8  reason?
9    A.  No.
10   Q.  And you said you got back from being sick.
11       Were you out on leave?
12   A.  Yes.  I was out on disability for about, I
13  think, four days.
14   Q.  Okay.  What position did you hold while
15  you were employed by Cogent?
16   A.  I was account -- actually, the regional
17  account manager.
18   Q.  So a RAM?
19   A.  Uh-huh.
20   Q.  Okay.  And did you hold that position the
21  entire time?
22   A.  Yes.
23   Q.  And what office did you work in for
24  Cogent?
25   A.  Houston.

12

```
 1        Q.   And did you work in any other office?
 2        A.   No.
 3        Q.   Have you ever been to any other office of
 4   Cogent?
 5        A.   Yes.  I've been to the Chicago office.
 6   Well, I wasn't at the D.C., but it was for a sales
 7   kickoff.  But we met all the employees.
 8        Q.   So when you -- you said that -- you
 9   referred to the sales kickoff.
10                  Are you referring to the sales
11   kickoff in January of 2012 -- I'm sorry -- strike
12   that -- 2010?
13        A.   Yes, uh-huh.
14        Q.   And that was not actually in the D.C.
15   office?
16        A.   No, it was not.  It was actually at a
17   hotel.
18        Q.   Okay.  And -- but you said you met --
19        A.   The D.C. team.
20        Q.   -- the D.C. team?
21        A.   Uh-huh.
22        Q.   Okay.  And you said Chicago.
23                  When did you visit the Chicago
24   office?
25        A.   In March of 2010.
```

13

1  Q. And why did you visit the Chicago office?
2  A. It was called field training.
3  Q. Okay. And in this field training, did you
4  work with any particular RAM in the Chicago
5  office?
6  A. I worked with Fitz Anderson and Brian
7  Floeckher and I can't remember his last name, but
8  his name was Tony. It was called shadow training.
9  We sat at his desk.
10 Q. You sat -- so let me back up.
11     So this was for the shadow training
12 in Chicago?
13 A. It was called field training.
14 Q. I'm sorry. It was called field training.
15 A. But they call it shadow when you go with
16 another rep.
17 Q. Okay.
18 A. So I basically just watched what he does
19 from day to day, and we're sitting in his desk on
20 the phone.
21 Q. And so the shadow training was part of the
22 field -- or the shadowing was part of the field
23 training that you had in Chicago?
24 A. Right, uh-huh.
25 Q. And so you shadowed a RAM named Tony?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

1  Q.  (BY MS. MCELROY)  My question is, so you
2  said that you understood it was going to be an
3  exempt position.
4       What did you think that meant?
5  A.  Right.
6       I've worked in a salaried position
7  before.  So when it says that, you work your 40
8  hours, and that's it.  And that's what you get
9  salary for.  I never had to work overtime in a
10 salaried position.
11 Q.  So it's your understanding that what --
12 what it means to be an exempt employee is that you
13 get paid a salary for 40 hours, and you don't have
14 to work more than 40 hours?
15 A.  Right.  That's what I thought, uh-huh.
16 Q.  Okay.  And so you understood, too, when
17 you signed that that you wouldn't be eligible for
18 overtime.
19      So this was a position where you
20 wouldn't be paid overtime?
21 A.  Right, but they didn't say there was
22 overtime required, either.
23      MS. MCELROY:  Again, I am going to
24 strike as nonresponsive, but thank you.
25      MS. CASH:  I think she's answering

1  because you are not" -- because we just started.
2              But it was everybody else that was in
3  the room, uh-huh.
4      Q.  Okay.  Well, did you ever complain to
5  anyone about the fact that he said you couldn't
6  get outside the office?
7      A.  Yeah.  I mean, we complained.  I mean,
8  honestly, to him, I didn't complain to him, no,
9  but I complained to Jennie.
10     Q.  Okay.  So you complained to Jennie about
11 Fitz saying you couldn't leave the office?
12     A.  Right.
13             And so she said, well, Fitz is over
14 me.  That's what she told us.  There was nothing
15 we could do.  He is the VP over sales, so we --
16 the point of them putting us on lockdown is they
17 thought doing more Siebel activity would create
18 sales.
19             So that was why he said it's better
20 for you to do it over the phone.
21     Q.  And did you ever complain to Jim Bubeck
22 about Fitz saying -- putting you on lockdown?
23     A.  No.  At that time, I hadn't met Jim Bubeck
24 yet.
25     Q.  Okay.  Well, how long were you on lockdown

1  for?
2       A.   Actually, for me, the whole time we were
3  on lockdown.
4       Q.   So for the entire time of your employment,
5  you weren't allowed to go outside the office?
6       A.   No.  Not on appointments, no.
7       Q.   So not on appointments --
8       A.   Not even on luncheons, either, as well.
9       Q.   So there was -- was there any circumstance
10 under which you could leave the office to do sales
11 activity after --
12      A.   When they have -- her name is -- she is
13 from D.C.  She set up those marketing events,
14 social -- the ice cream social stuff.  We can go
15 out for that for the building.
16      Q.   Do you mean a lobby event?  Is that kind
17 of what you meant?
18      A.   Well, yeah --
19      Q.   Is that what --
20      A.   -- technically.
21      Q.   So other than an ice cream social or some
22 kind of marketing or lobbying event, there were no
23 other circumstances under which you were allowed
24 to go out of the office to do your sales
25 activities?

1    A.   No, no.  Just for that, yeah.

2    Q.   Okay.

3    A.   Every -- the meetings we had were

4    over-the-phone conference calls.

5    Q.   Okay.

6              (Exhibit 32 was marked.)

7    A.   Uh-huh.

8    Q.   (BY MS. MCELROY)  Is this an e-mail that

9    you sent to Fitz Anderson at the bottom on January

10   15th, 2010?

11   A.   Yes.

12   Q.   Was this after your sales kickoff?

13   A.   Yes.

14   Q.   Now, it says, "Good morning, Fitz.  I did

15   35 activities yesterday.  I will try to do more

16   activity and drop-bys today.  I am going to start

17   introducing myself to property managers soon.

18   Talk to you soon.  Warm regards."

19   A.   Yes, uh-huh.

20   Q.   When you say, "drop-bys," what did that

21   mean?

22   A.   Drop-bys?  Drop by information.

23   Q.   And where would you drop by information?

24   A.   Actually, I didn't drop by any

25   information.

46

1    A.   Any type of schedule?

2    Q.   Work schedule.

3    A.   The only thing is she said, "Be here at

4  8:30."

5             That's pretty much it.

6    Q.   So Jennie required you to get there at

7  8:30?

8    A.   Uh-huh.

9    Q.   Okay. And did you get in at 8:30?

10   A.   Actually, I was there before 8:30.

11   Q.   What time would you get in?

12   A.   Anywhere from 8:00 to 8:15ish.

13   Q.   And would you normally be the first person

14  in?

15   A.   Actually, Michelle always beat me in.  I

16  am second.

17   Q.   What about Ray?

18   A.   Well, Ramon came in actually later.  Ramon

19  worked late.  He worked the Mexico market.

20   Q.   So -- I am sorry.

21             So Ray --

22   A.   So he came in later.

23   Q.   Okay.  So -- so would he get there by

24  8:30, or would he come in after 8:30, as well?

25   A.   I didn't pay much attention to Ray's

49

1  Q.  You said the 60 Siebel activities.
2       Who required these 60 Siebel
3  activities?
4  A.  Fitz Anderson.
5  Q.  And anyone else, or was it only Fitz?
6  A.  Only Fitz, because he's over Jennie.
7  That's who she reported to.
8  Q.  And you said after -- you had testified
9  earlier that after -- it was after Fitz you said
10 that it was --
11 A.  Brian.
12 Q.  -- Brian, and then it was Kevin.
13      Did Brian and Kevin also require 60
14 Siebel activities?
15 A.  Yes.  Nothing changed in Siebel.  We did a
16 weekly report.  We were required to have a certain
17 amount of activities and sales and then call
18 dials.  It's called the Dashboard that they get
19 every week.
20 Q.  That who gets every week?
21 A.  Well, our boss, Jennie, gets it, and she
22 forwards it to her boss.
23 Q.  So Jennie would get this Dashboard, and
24 she would forward it to the Director of Sales?
25 A.  She forward us the Dashboard so we could

50

1  calculate how many dials did we have, how many
2  calls, how many went for appointments.  It's like
3  a little weekly report that was due on Friday.
4       Q.  Okay.  Did Cogent require you to stay at
5  work until a specific time, or did your -- let me
6  back up.
7            Did your -- did Jennie require you to
8  stay until a certain time every day?
9       A.  Did she require me to stay at a time every
10 day?  We had to get the Siebels done.  Yeah.  We
11 had to get the 60 Siebels in.
12      Q.  Okay.  Well, how long would that
13 normally -- so if you had to get the 60 Siebels
14 done per day, how long would that normally take
15 you?  By what time were you able to leave at
16 night?
17      A.  Honestly, getting 60 Siebels, most of the
18 time I didn't take a lunch and -- in order to
19 obtain that 60 Siebels.  And then I normally leave
20 maybe -- I left maybe around 6:00.
21      Q.  So you're saying it would -- normally by
22 6:00, you would be finished?
23      A.  Yeah, about 6:00, 6:30ish, yeah, at the
24 latest.  It takes a while to get 60 Siebels.  40
25 Siebels was already a lot, and adding the

51

1    additional 20 was a little overwhelming for the
2    team.
3        Q.  And did you every day manage to meet this
4    alleged 60 Siebel activity requirement?
5        A.  Yes.  Or unless it was an event, then no.
6    Then they'll give us an excuse not to have 60
7    Siebels in.
8        Q.  If you went outside the office, you had an
9    excuse?
10       A.  For an event for the Marketing Department
11   in D.C. that scheduled, you were assigned to go
12   out.
13       Q.  So other than a marketing event, that
14   was -- was that the only occasion where they would
15   give you an exception to the 60 Siebel
16   requirement?
17       A.  Yes, for that.
18       Q.  Did you ever work from home?
19       A.  Did I ever work from home?  No.  There was
20   one person that I know of that did.
21       Q.  Who?
22       A.  Nathania Reed.
23       Q.  She would work from home?
24       A.  Uh-huh.
25       Q.  How do you know that?

52

1   A.  Because everybody in the office knew she
2   did that.  We didn't even know we were allowed to
3   do it.  She had sent me an e-mail before with the
4   link.
5   Q.  The link that would be able to provide you
6   to be able to work from home?
7   A.  Uh-huh.
8   Q.  Okay.  Did your job duties as a RAM differ
9   from the job duties of the RAMs outside of
10  Houston; do you know?  Do you know?
11  A.  Technically, we did the same thing.
12  Q.  And what was that you did?
13  A.  Make phone calls, qualify the person over
14  the phone.
15  Q.  And how do you know that outside of
16  Houston you did the same thing?
17  A.  Well, based on Sherrie in Dallas, based on
18  the people in Miami when I talked to them and met
19  them in D.C., a lot of people do it from the
20  phone.
21  Q.  Who in Miami did you speak to?
22  A.  Offhand -- I can't think of it offhand.
23  Q.  You can't think of who in Miami you spoke
24  to?
25  A.  Not offhand, right.

68

1  activity.  Sorry.  I am a little slurry.
2      Q.  And so -- so you don't know one way or the
3  other whether or not RAMs outside of Houston were
4  prospecting in person?
5      A.  No.
6              When I went to Chicago, everybody
7  there, even the most successful, Tony, he -- he
8  doesn't go to the field.
9      Q.  And what's Tony's last name?
10     A.  I don't know it offhand.
11     Q.  So --
12     A.  He's based out of Chicago.
13     Q.  I apologize.
14             So Tony in Chicago, he never went out
15  in the field during those three days that you were
16  doing shadow training with him?
17     A.  No, we sat at the desk, huh-huh.
18     Q.  Do you know if he ever went out in the
19  field on days outside of those three days?
20     A.  No, because he told me he doesn't go out
21  of the office.  Even the people -- that's Fitz's
22  office, by the way, in Chicago.  They don't go
23  out.
24     Q.  So Tony told you that he never goes
25  outside the office?

1   A.  No.  He showed me what he did, and that
2   was over the phone.
3   Q.  Okay.  So then based on your -- after -- I
4   know you said you did your shadow training or your
5   field training in the Chicago office and you spoke
6   to Tony then and you watched them then.
7           Did you speak to anyone else in
8   Chicago after that about what they were doing
9   outside of the office?
10  A.  Well, Brian was there.  I talked to Brian.
11  He was there.  And there were other a couple of
12  other people -- I can't remember offhand their
13  names -- that was in the office.  And I have to
14  maybe look at the roster to remember who I spoke
15  with specifically.
16  Q.  What about after the shadow training; did
17  you keep in touch with anybody from Chicago?
18  A.  No.  I didn't think they were very
19  friendly.
20  Q.  You didn't think they were very friendly?
21  A.  No.
22  Q.  Okay.  How much time did you spend each
23  day prospecting by phone and by e-mail?
24  A.  How much time?  I would say by -- phone
25  and by e-mail?  I would say maybe 80 percent of

150

1  COUNTY OF HARRIS )

2  STATE OF TEXAS   )

3      I hereby certify that the witness was

4  notified on

5              that the witness has 30 days or

6  days per agreement of counsel) after being

7  notified by the officer that the transcript is

8  available for review by the witness and if there

9  are any changes in the form or substance to be

10 made, then the witness shall sign a statement

11 reciting such changes and the reasons given by the

12 witness for making them;

13     That the witness' signature was/was not

14 returned as of             .

15     Subscribed and sworn to on this, the 3rd

16 day of June, 2012.

17

18

19
                SAMANTHA DOWNING, CSR, CLR
20              CSR # 7512
                DAVID FELDMAN WORLDWIDE, INC.
21              450 SEVENTH AVENUE STREET
                SUITE 500
22              NEW YORK, NEW YORK  10123
                Phone: 212.705.8585
23

24

25