IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAMON LAGOS, et al. | § | |
| | § | |
| versus | § | CIVIL ACTION NO. H-11-4523 |
| | § | |
| | § | |
| COGENT COMMUNICATIONS, INC. | § | |

## ORDER

Pending before the Court are Defendant's Motion to Compel, Motion to Strike, and Motion to Dismiss (**Instrument No. 79**); Motion for Partial Summary Judgment (**Instrument No. 85**); and Motion to Decertify the Collective Action (**Instrument No. 86**). Also pending is Defendant's Motion to Strike Plaintiffs' Sur-Reply to the Motion for Partial Summary Judgment (**Instrument No. 97**).

### I.

### A.

On December 21, 2011, Plaintiffs Ramon Lagos ("Lagos"), Michelle Sparrow ("Sparrow"), and Carla Obasuyi ("Obasuyi") (collectively, "Named Plaintiffs"), individually and on behalf of all others similarly situated, filed suit against Defendant Cogent Communications, Inc. ("Defendant" or "Cogent") to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (Instrument Nos. 1, 11).

Named Plaintiffs filed a Motion for Notice to Potential Plaintiffs and for Conditional Certification on July 9, 2012 (Instrument No. 19), and the Court held a hearing on the motion on November 2, 2012. On November 14, 2012, the Court conditionally certified the following class: "All current and former Global Account Managers and Regional Account Managers, employed by COGENT COMMUNICATIONS, Inc. between December 21, 2008 to the present, who

worked over 40 hours in a work week." (Instrument No. 29 at 20). Defendant and Named Plaintiffs subsequently agreed to the form of notice to potential opt-in plaintiffs, allowing potential opt-in plaintiffs sixty days from the date notice was sent to file a consent form with the Court. (Instrument No. 31-1; Instrument No. 32). The parties agree that Named Plaintiffs mailed the notices and consent forms to potential opt-in plaintiffs on December 14, 2012, and that the period for individuals to join the lawsuit ended on February 12, 2013. (Instrument No. 79 at 9; Instrument No. 84 at 8). 157 individuals (collectively, "Opt-In Plaintiffs") filed Notices of Consent to join the collective action. (Instrument Nos. 34-54, 55-60, 62, 64).

Defendant has now filed a Motion to Compel, Motion to Strike, and Motion to Dismiss (Instrument No. 79), arguing that eleven Opt-In Plaintiffs (collectively, "Arbitration Opt-In Plaintiffs") are subject to mandatory arbitration provisions governing any FLSA claims. Defendant also moves to strike fourteen Opt-In Plaintiffs (collectively, "Late Opt-In Plaintiffs") who filed late Notices of Consent. Defendant also moves to dismiss forty-seven Opt-In Plaintiffs (collectively, "Noncompliant Opt-In Plaintiffs") who did not adequately respond to interrogatory responses. Plaintiffs have filed a response, conceding that Noncompliant Opt-In Plaintiffs should be dismissed but arguing that the Court should not compel arbitration for Arbitration Opt-In Plaintiffs or strike Late Opt-In Plaintiffs. (Instrument No. 84). Defendant has filed a reply (Instrument No. 87), and Plaintiffs have filed a sur-reply (Instrument No. 90).

Defendant has also filed a Motion for Partial Summary Judgment (Instrument No. 85), arguing that the Court should apply a two-year statute of limitations in this lawsuit because Defendant's purported violations were not willful as a matter of law. Specifically, Defendant argues that 45 Opt-In Plaintiffs (collectively, "3-Year Opt-In Plaintiffs") filed their Notices of Consent more than three years after their employment relationship with Cogent ended, making

their claims time-barred regardless of whether the Court applies a three-year or two-year statute of limitations. (Instrument No. 85 at 6). Additionally, Defendant argues that an additional 33 Opt-In Plaintiffs (collectively, "2-Year Opt-In Plaintiffs") filed their Notices of Consent more than two years, but less than three years, after their employment relationships with Cogent ended, making their claims time-barred if the Court applies a two-year statute of limitations. (Instrument No. 85 at 6). Plaintiffs oppose Defendant's motion on the issue of willful violation and argue that the 2-Year Opt-In Plaintiffs should not be dismissed. (Instrument No. 91 at 6). However, Plaintiffs do not oppose summary judgment on the claims of the 3-Year Opt-In Plaintiffs. (Instrument No. 91 at 6). Defendant has filed a reply (Instrument No. 93), and Plaintiffs have filed a sur-reply (Instrument No. 95). Defendant has also filed a motion to strike the sur-reply, arguing that the sur-reply is unwarranted and contains new and objectionable summary judgment evidence. (Instrument No. 97). Plaintiffs have filed a response to the motion to strike. (Instrument No. 98).

Finally, Defendant has filed a Motion to Decertify the Collective Action (Instrument No. 86), arguing that Named Plaintiffs and Opt-In Plaintiffs are not similarly situated for the purposes of this case proceeding collectively. Defendant argues that, because too many differences exist among the class members in the way they conducted their work for Cogent, the parties cannot rely on any representative experience to answer the relevant misclassification and damages issues in this case. (Instrument No. 86 at 7). Plaintiffs respond that all Named Plaintiffs and Opt-In Plaintiffs are similarly situated and spent the vast majority of their time inside making sales calls, such that the outside sales exemption does not apply. (Instrument No. 92 at 9). Defendant has filed a reply (Instrument No. 94), and Plaintiffs have filed a sur-reply (Instrument No. 96).

**B.**

Cogent is a multinational Internet Service Provider ("ISP") that provides Internet access and data transport services. (Instrument No. 86-2 at 3). Cogent employs a global sales force comprised of Regional Account Managers ("RAMs") and Global Account Managers ("GAMs"), who are located in fifteen United States field offices and in Canada. (Instrument No. 82 at 3). Each sales office is managed by a Regional Sales Manager, and each Regional Sales Manager reports to a Director of Sales. (Instrument No. 86-3 at 5-6). Both the RAM and GAM positions are sales positions, but the positions differ in terms of what employees sell, to whom they sell, the size of the clients, and where they sell. (Instrument Nos. 86-3 at 4; 86-4 at 5-6; 86-5 at 4). For example, although RAMs and GAMs have the same general duties, GAMs have a wider, global geographic range and sell all the products Cogent offers, while RAMs sell only in the United States and Canada and may only sell certain products. (Instrument No. 86-5 at 4-5).

Cogent employed Named Plaintiffs in its Houston office. Cogent employed Lagos from December 2009 until September 2011 as a GAM. (Instrument No. 86-6 at 3-5). Cogent employed Sparrow from September 2009 until April 2010 as a RAM. (Instrument No. 86-7 at 3-4). Cogent employed Obasuyi from December 2009 until August 2010 as a RAM. (Instrument No. 86-8 at 3-5). Opt-In Plaintiffs worked in fifteen different Cogent sales offices under twenty-eight different Regional Sales Managers and twelve different Directors of Sales. (Instrument No. 86-10 at 3-4). The parties agree that Cogent classifies both RAMs and GAMs as exempt employees under the FLSA. (Instrument No. 86 at 12; Instrument No. 92 at 16). The primary exemption Cogent has applied to RAMs and GAMs is the outside sales exemption.

Jeff Karnes, Cogent's Chief Revenue Officer and Vice President of Global Sales, testified as Cogent's corporate representative that the general job description for RAMs and GAMs had

not changed over time. (Instrument No. 92-2 at 9). Cogent has changed "product nuances," sales quotas, and territories, but the changes have not affected "how [RAMs and GAMS] do the job." (Instrument No. 92-2 at 9-10). James Bubeck, Cogent's Vice President of Field Sales and responsible for overseeing all of Cogent's North American field offices, stated in his affidavit that the RAM and GAM positions "are meant to be outside sales positions." (Instrument No. 86-2 at 2-4). Karnes similarly testified that the first thing he tells new RAM and GAM hires is that "sitting behind a computer and spanning [sic] out e-mail, it's the kiss of death" and that employees will only be successful by leaving the office to conduct outside sales. (Instrument No. 86-3 at 13). Specifically, Bubeck stated that "RAMs and GAMs are supposed to conduct meetings with customers face to face, canvas/walk buildings for prospective customers, cold call on prospective customers, maintain relationships with property managers or data center operators, network to build relationships, and host lobby events . . . ." (Instrument No. 86-2 at 4). Bubeck stated that other tasks, conducted inside the field offices, were meant to "prepare for and facilitate their outside sales activities." (Instrument No. 86-2 at 4). These activities included "developing and advancing their funnel, identifying prospective customers, researching and managing their calendars, and entering their sales efforts in Siebel, which is Cogent's customer relationship management database." (Instrument No. 86-2 at 4). Bubeck also states that GAMs typically spend more time in the field office than RAMs do because their client base is more global and not located in the local market. (Instrument No. 86-2 at 4). Bubeck alleges that he encourages RAMs, and to a lesser extent GAMs, to conduct outside sales for an average of two to four hours per day and to push for face-to-face appointments. (Instrument No. 86-2 at 4-5). However, he states that Cogent directors grant RAMs and GAMs "the discretion to determine the amount of time he or she will spend inside the office versus outside the office performing sales

activities." (Instrument No. 86-2 at 5). Bubeck claims that the amount of time each RAM or GAM spends outside the office varies based on, for example, the "local market, sales habits, discipline, customer preferences, customer location, manager, work environment, tenure, and book of business." (Instrument No. 86-2 at 5). Karnes and Bubeck's testimony is supported by affidavits from other managers at Cogent and non-plaintiff current RAMs and GAMs. *See, e.g.*, (Instrument Nos. 86-11; 86-13; 86-14; 86-15; 86-16; 86-17).

Named Plaintiffs and Opt-In Plaintiffs have introduced evidence that RAMs and GAMs spend most of their time on inside sales activities, communicating with property owners, managers, and tenants over telephone and e-mail. *See, e.g.*, (Instrument Nos. 92-3 at 27-29; 92-4 at 10; 92-5 at 10-12). For example, Lagos testified that although he began working for Cogent with the understanding that he was "supposed to do a lot of cold calls, . . . visiting customers, face-to-face meetings," he realized that other RAMs and GAMs were making more sales if they stayed in the office. (Instrument Nos. 92-3 at 27-28). Lagos stopped doing any outside sales visits because Cogent exerted "too much control on those face-to-face appointments," including calling the customer to see if the employee actually visited the customer. (Instrument Nos. 92-3 at 29). Obasuyi testified that the entire time she worked at Cogent, the office was on "lockdown" and employees were not allowed to go outside the office for sales appointments, because the managers told them they could not leave. (Instrument No. 92-5 at 10-12). Interrogatory answers from thirty-three Opt-In Plaintiffs demonstrate that thirteen RAMs and GAMs report spending no time working outside the office. *See* (Instrument Nos. 86-21, 86-23, 86-25, 86-26, 86-27, 86-29, 86-31, 86-32, 86-37, 86-43, 86-48, 86-49, 86-50). Ten report spending between one and five hours per week conducting outside sales. *See* (Instrument Nos. 86-22, 86-34, 86-35, 86-36, 86-38, 86-41, 86-44, 86-45, 86-46, 86-50). Five report spending between six and ten hours per week

conducting outside sales. *See* (Instrument Nos. 86-20, 86-24, 86-30, 86-33, 86-47). Four report spending more than ten hours per week conducting outside sales, including one employee who worked outside the office an average of sixteen hours per week. *See* (Instrument Nos. 86-19, 86-28, 86-39, 86-40). Finally, one employee did not report the number of hours per week she conducted outside sales work, noting only that she worked outside the office an average of one to two days per week. *See* (Instrument No. 86-42).

Three Opt-In Plaintiffs from the Houston office, for example, reported working outside the office an average of three hours per week, two to four hours per week, four hours per week and fifteen hours per week, respectively. *See* (Instrument Nos. 86-34; 86-38; 86-39, 86-41). Two employees from one of Cogent's Los Angeles offices, working under the same Regional Sales Manager, report not working outside the office at all and working fifteen hours per week outside the office, respectively. *See* (Instrument Nos. 86-26; 86-28). Three GAMs respectively report never working outside the office, working outside the office one hour per week, and working outside the office eight hours per week. *See* (Instrument Nos. 86-21; 86-36, 86-30). Four RAMs respectively report never working outside the office and working outside the office three hours, six hours, and eight to nine hours per week. *See* (Instrument Nos. 86-48; 86-46, 86-47, 86-24).

## II.

### A.

Section 207(a) of the FLSA requires covered employers to compensate non-exempt employees at overtime rates for time worked in excess of statutorily-defined maximum hours. 29 U.S.C. § 207(a). Section 216(b) of the FLSA provides that a person may maintain an action on "behalf of himself . . . and other employees similarly situated" to recover unpaid overtime wages. 29 U.S.C. § 216(b). However, several categories are exempted from the FLSA's overtime

compensation requirements, including those classified as "outside sales employees." 29 C.F.R. §
541.500. Outside sales employees are defined as any employee whose primary duty is making
sales and "[w]ho is customarily and regularly engaged away from the employer's place or places
of business in performing such primary duty." *Id.* at § 541.500(a). "The logic of the exemption is
that '[s]uch [a] salesman, to a great extent, works individually. There are no restrictions
respecting the time he shall work and he can earn as much or as little, within the range of his
ability, as his ambition dictates.'" *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581
(5th Cir. 2013) (quoting *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941)).

Courts recognize two methods to determine whether to authorize notice to similarly
situated employees advising them of their right to join an FLSA collective action. These methods
are the two-step approach in *Lusardi*, which imposes different and less stringent requirements
than a Rule 23 class action, and the *Shushan* approach, which imposes the requirements of a Rule
23 class action. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987); *Shushan v. Univ. of
Colo. at Boulder*, 132 F.R.D. 263 (D. Colo.1990). In *Mooney v. Aramco Services Co.*, 54 F.3d
1207, 1212 (5th Cir. 1995), overruled on other grounds by *Desert Palace, Inc. v. Costa*, 539 U.S.
904 (2003),[1] the Fifth Circuit found it unnecessary to determine which method is most
appropriate. Since *Mooney*, however, the Fifth Circuit has acknowledged the inapplicability of
Rule 23 to a § 216(b) action in at least one context, holding that the interlocutory appeal
provisions of Rule 23(f) do not apply in a § 216(b) action because a "216(b) FLSA action is not a
Rule 23 class action." *Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 932 (5th Cir. 2005). This
Court followed *Lusardi*'s stage one analysis when it determined that conditionally certification
was appropriate. *See generally* (Instrument No. 29).

---

[1] Although *Mooney* was litigation under the Age Discrimination in Employment Act ("ADEA"), it applies here
because the ADEA explicitly incorporates Section 216(b) of the FLSA.

The first stage of the *Lusardi* analysis is the "notice stage," in which the district court decides whether to issue notice to potential class members. *Mooney*, 54 F.3d at 1213-14. "*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the [two-stage] analysis." *Id.* at 1213. The court's decision in this first stage is often based only on the pleadings and affidavits that have been submitted. *Id.* at 1213-14. "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" that provides potential class members with notice and the opportunity to opt-in. *Id.* at 1214. Although lenient, this standard requires a factual basis for allegations that potential members "were together the victims of a single decision, policy, or plan." *Id.* at 1214. At this first stage, there must be a showing of "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *Barron v. Henry County Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003). "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *see also Barron*, 242 F. Supp. 2d at 1104 ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences.").

On November 14, 2012, the Court conditionally certified the following class: "All current and former Global Account Managers and Regional Account Managers, employed by COGENT COMMUNICATIONS, Inc. between December 21, 2008 to the present, who worked over 40

hours in a work week." (Instrument No. 29 at 20). After conditional certification of the class, the action has proceeded as a collective action during discovery. *See Mooney*, 54 F.3d at 1214.

Following discovery, the court enters the second phase of the *Lusardi* analysis. With the aid of information gained in discovery, the court considers if the opt-in plaintiffs are "similarly situated" to the named plaintiffs. If they are, the representative action may proceed. If they are not, the class is decertified, the opt-in plaintiffs are dismissed, and the original named plaintiffs may proceed with their own claims only.

At this second stage, the burden is on the plaintiffs to prove that the individual class members are similarly situated. *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280-281 (N.D. Tex. 2008) (citing *Bayles v. Am. Med. Response of Col., Inc.*, 950 F. Supp. 1053, 1062-63 (D. Colo. 1996); *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003)). Because the parties have been able to conduct discovery, the similarly-situated inquiry at the second stage is much more stringent. *Id.* (citing *Harris v. FFE Transp. Servs., Inc.*, NO. 3:05-CV-0077-P, 2006 U.S. Dist. LEXIS 51437, at *7-8 (N.D. Tex. May 15, 2006)). The court considers several factors at this stage in the analysis, including: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Mooney*, 54 F.3d at 1213 n.7 (citing *Lusardi*, 118 F.R.D. at 359).

While the plaintiffs must show that putative class members are "similarly situated," this does require that they be "identically situated." *Proctor*, 250 F.R.D. at 280-281 (citing *Helmerich*, 1992 U.S. Dist. LEXIS 5367, at *2). Instead, the question is if there is "a demonstrated similarity among the individual situations[,] . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged

[policy or practice.]" *Id.* (citing *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1998)). Decertification is proper if "the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Burt v. Manville Sales Corp.*, 116 F.R.D. 276, 277 (D. Colo. 1987). The Court must also consider if it can coherently manage the class in a manner that will not prejudice any party. *Lusardi*, 118 F.R.D. at 360. If there is "no single decision, policy, or plan" that affects the putative class members, the case will encounter manageability problems and the motion to decertify should be granted. *Id.*

## B.

Defendant argues that Plaintiffs' disparate factual and employment settings require decertification of the collective action. (Instrument No. 86 at 15). Defendant claims that, given its affirmative defense that Plaintiffs were properly classified as exempt outside employees, the Court must focus its analysis on the degree of similarity between Plaintiffs as to their time spent outside the office and the various expectations and requirements that limited Plaintiffs' discretion over their outside sales activities. (Instrument No. 86 at 15); *see also Tracy v. NVR, Inc.*, 293 F.R.D. 395, 397-99 (W.D.N.Y. 2013) (in an outside sales case, defining the relevant inquiry as "the amount of time that [the class members] generally spent on activities outside of the office setting," particularly when employees "had broad discretion to decide how to allocate their time . . . ."). Specifically, Defendant claims that Opt-In Plaintiffs testified to a wide range of time spent both on outside sales activities and on inside sales activities preparing for outside sales activities. (Instrument No. 86 at 16-18). Furthermore, Defendant argues that Opt-In Plaintiffs have provided varying testimony as to the number and type of sales activities that Defendant required of them. (Instrument No. 86 at 19-20).

Plaintiffs respond that Opt-In Plaintiffs are similarly situated to each other and to Named Plaintiffs because: all were employed as "Account Managers" at Cogent; all were impacted by the same compensation structure, which classified their jobs as exempt and denied them overtime wages for hours worked in excess of forty per week; all had the same job description; all were supervised by Regional Sales Managers; and all worked under the same pay policies. (Instrument No. 92 at 14).

In *Tracy*, the Western District of New York held that the plaintiffs, who sold new homes to be constructed in new housing communities, were not similarly situated and decertified the collective action. *Tracy*, 293 F.R.D. 395. The court found that the plaintiffs' primary duty was to sell the homes, but that the employees maintained discretion over the means by which they conducted the sales and the amount of time they allocated to their duties. *Id.* at 397. The *Tracy* plaintiffs spent a differing amount of time away from their home work site, based on both individual choice and the preferences of their direct supervisors. *Id.* at 397-99. Specifically, the named plaintiff alleged he spent "minutes" per month conducting outside sales, and the opt-in plaintiffs stated that they spent between four and nine hours per week outside their home site. *Id.* at 399. The court held that decertification was appropriate after noting that "the ultimate success of the plaintiffs' claims and [the defendant's] defenses in this action will depend largely on the amount of time that [the employees] generally spent on sales activities outside of the office setting, and thus, the factual similarity that the plaintiffs seek to demonstrate in response to the instant motion is appropriately focused upon that issue." *Id.* at 397-98 (citing *Wage & Hour Op. Letter* FLSA 2007–2, 2007 WL 506575 *3 (Department of Labor opinion letter explaining that sales associates who are frequently absent from the model home, at least one to two hours per

day, twice a week, for the performance of indispensable components of sales efforts, is an exempt outside salesperson under the FLSA)).[2]

Here, Plaintiffs' evidence reveals that they spent a varying amount of time on outside sales activities and on inside sales activities supporting their outside sales. For example, in considering interrogatory answers from thirty-three Opt-In Plaintiffs,[3] thirteen Plaintiffs reported spending no time working outside the office, ten Plaintiffs reported spending between one and five hours conducting outside sales, five Plaintiffs report spending between six and ten hours conducting outside sales, four Plaintiffs report spending more than ten hours per week conducting outside sales, and one Plaintiff reported working outside the office one to two days per week. Plaintiffs argue that the varying amounts of time spent on outside sales activities are immaterial, because the above "minor differences" are immaterial to the collective resolution of whether Plaintiffs were misclassified. (Instrument No. 92 at 20-21). Defendant responds that that variance among the class is not immaterial, but rather demonstrates that at trial the jury would have to assess each individual Plaintiff's time spent conducting outside sales activities. (Instrument No. 94 at 10-11).

First, the Court notes that, in determining whether the differences between Plaintiffs will require individual factual inquiries, it is necessary to consider the requirements of the outside sales exemption. Although Plaintiffs allege such an inquiry is an inappropriate merits-based

---

[2] Although the *Tracy* court cited to another Department of Labor opinion (2007 WL  506574), issued on the same day, it appears clear that the court intended to cite to the above-referenced opinion (2007 WL 506575). Specifically, the 2007 WL 506574 opinion actually cited does not refer to employees being absent from the home work site for one or two hours a day, one or two times a week, but the 2007 WL 506575 opinion does. The decision at 2007 WL 506575 also contains the additional information referred to by the parties. *See* (Instrument No. 94 at 10); (Instrument No. 96 at 6-7).

[3] Defendant chose these representative Opt-In Plaintiffs by first excluding the Opt-In Plaintiffs whom Defendant argues should be dismissed for separate reasons, including employees with time-barred claims, employees who failed to respond to discovery, employees allegedly subject to arbitration agreements, and employees who filed Notices of Consent after the opt-in deadline. (Instrument No. 86 at 8 n.3).

analysis, the Court stresses that its analysis does not implicate the merits of Plaintiffs' claims. Rather, "the ultimate success of [P]laintiffs' claims and [Defendant's] defenses in this action will depend largely on the amount of time that [Plaintiffs] generally spent on sales activities outside of the office setting, and thus, the factual similarity that [P]laintiffs seek to demonstrate in response to the instant motion is appropriately focused upon that issue." *Tracy*, 293 F.R.D. at 397-98. Determining whether the differences in Plaintiffs' reported hours are "minor differences" or potentially determinative of Plaintiffs' claims at trial requires the Court to consider the requirements of the outside sales exemption. *See Wong v. HSBC Mortgage Corp. (USA)*, C07-2446MMC, 2010 WL 3833952 *2-*4 (N.D. Cal. Sept. 29, 2010).

Even small variations in the time spent outside the office can determine whether an employee is exempt or not under the outside sales exemption. In *Tracy*, the opt-in plaintiffs' amount of time spent on outside sales activities varied from "minutes" per month to between four and nine hours per week. *Tracy*, 293 F.R.D. at 399. The court found that this variation would require dozens of mini-trials to determine the applicability of the exemption to each plaintiff. *Id.* In so holding, the court relied on a Department of Labor opinion finding that sales-related activity outside the office "one or two hours a day, one or two times a week" satisfied the requirement that the employee regularly engaged in outside sales activities. *Wage & Hour Op. Letter FLSA 2007–2*, 2007 WL 506575 at *3. Similarly, the Southern District of California has held that an employee who spent 10-20% of his time on outside sales was exempt as a matter of law. *Lint v. Nw. Mut. Life Ins. Co.*, 09-1373, 2010 WL 4809604 *3 (S.D. Cal. Nov. 19, 2010). Here, Opt-In Plaintiffs allege anywhere from zero to sixteen hours of outside sales activities each week. Prior interpretations of the requirements of the outside sales exemption indicate that a reasonable jury could find some Plaintiffs in this case to be exempt while others are not exempt.

Any factual determination of this issue would require the jury to make an exemption determination for each individual Plaintiff.

Plaintiffs claim that the Department of Labor opinion is inapposite to their lawsuit against Cogent because the opinion stressed, "[it] is the nature of the time spent outside the model home, rather than the amount of time, that drives our conclusion. Virtually all of the indispensable components of the sales effort are concentrated in the outside period." *Wage & Hour Op. Letter*, 2007 WL 506575 at n.2. Plaintiffs argue that, here, the outsides sales could not have been an indispensable component of Plaintiffs' sales efforts because many Plaintiffs spent almost no time outside the office. However, Defendant has provided extensive testimony indicating that Cogent management did believe outside sales were essential, and communicated that to the RAMs and GAMs. (Instrument No. 86-2 at 2-4; Instrument No. 86-3 at 13; Instrument No. 86-9 at 5); *see also* (Instrument Nos. 86-11; 86-13; 86-14; 86-15; 86-16; 86-17). Similarly, Named Plaintiff Lagos testified that outside sales were necessary to his success, although he had to balance outside calls with computer entry quotas. (Instrument No. 86-6 at 8-10). Some Opt-In Plaintiffs stated that they were required to work outside the office, while others were not required to do so. *Compare* (Instrument No. 86-19 at 9-10) *with* (Instrument No. 86-20 at 10). Therefore, rather than demonstrating that the Department of Labor decision is inapplicable here, the evidence before the Court indicates that each individual Opt-In Plaintiff would need to be questioned about whether outside sales were indispensable to his or her success at Cogent.

The Court also considers whether there is any company-wide policy governing how employees spend their time or uniformity in work duties and experiences that diminishes the need for individualized inquiry. In *Wong*, the court held that plaintiff loan officers could not proceed as a class. The court first noted that "[t]he Ninth Circuit has recently recognized that

'[o]ften, [the outside salesperson exemption] will militate against certification because . . . it requires a fact-intensive inquiry into each potential plaintiff's employment situation,' given that "courts must . . . ask where the individual employees actually spent their time." *Wong*, 2010 WL 3833952 at *2 (quoting *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (internal quotation and citation omitted)).[4] The *Wong* court noted, however, that "centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." *Wong*, 2010 WL 3833952 at *2 (quoting *Wells Fargo*, 571 F.3d at 958-59). Although "[a] centralized policy requiring employees to be at their desks for 80% of their workday would change [an] individual issue into a common one," plaintiffs must show "company-wide policies governing how employees spend their time" or "uniformity in work duties and experiences that [would] diminish the need for individualized inquiry." *Wong*, 2010 WL 3833952 at *2 (quoting *Wells Fargo*, 571 F.3d at 958-59; *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009)). The *Wong* court then found that there was no evidence of a centralized rule, practice, or policy requiring loan officers to work in particular locations or for particular periods of time. *Wong*, 2010 WL 3833952 at *3. The court therefore reasoned that "factual findings as to the applicability of the outside sales exemption will need to be made" and that the applicability of the outside sales exemption could only be demonstrated by examining the particular circumstances of each opt-in plaintiff's employment situation. *Id.* at *4.

---

[4] The *Wells Fargo* decision concerned whether claims brought on behalf of a class should be certified under Fed. R. Civ. P. 23, which asks whether individual issues predominate over issues common to the class. *Wells Fargo*, 571 F.3d at 959. This is a higher standard than the § 216(b) analysis. The Court finds, however, that the opinion is instructive to the "similarly situated" inquiry under the second prong of *Lusardi*. *See Wong*, 2010 WL 3833952 at *2; *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 572 (E.D. La. 2008) (finding Fifth Circuit Rule 23 decision provided "guidance" in resolving issues presented in FLSA action; observing, "[t]here are strong parallels between a Rule 23 collective action in that both litigation devices operate to resolve the claims of many individuals based on representative evidence").

Plaintiffs here have identified no company-wide policy that would allow Plaintiffs' claims to be adjudicated collectively. Indeed, although Plaintiffs stress that all RAMs and GAMs had the same job description, the job description does not refer to the amount of time employees should spend on their respective tasks of "direct calling, email and contact efforts," as well as "consultive and relationship building techniques." *See* (Instrument No. 92-2 at 40). The job description therefore does not address how employees should divide their time between outside and inside sales. Furthermore, Plaintiffs themselves disclaim the importance of both the job description and any potential company-wide policy, asking the Court to look to "actual day-to-day job activities," not the job description or what Cogent intended its RAMs and GAMs to do. (Instrument No. 92 at 14-15). Because a determination of Plaintiffs' day-to-day job activities requires individualized inquiries for each Plaintiff, a jury would have to examine the particular circumstances of each Plaintiff's employment situation. *See Wong*, 2010 WL 3833952 at *4; *Wells Fargo*, 571 F.3d at 958-59.

Plaintiffs rely heavily on *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007), where the court found that the plaintiffs' factual and employment settings were substantially similar. The *Nerland* plaintiffs, classified as exempt under the executive employee exemption, were store managers whose job description provided a complete, uniformly applied description of all the plaintiffs' job duties. *Id.* at 1019, 1021. Therefore, no "inquiry into the individual *daily* job duties of each individual plaintiff to identify the actual scope of his or her job duties" was necessary. *Id.* at 1020 (emphasis in original). Here, however, there is no similar policy or job description that applies to all Plaintiffs and addresses the relevant question: whether Plaintiffs were properly classified as exempt outside salespeople. Therefore,

unlike in *Nerland*, the job description Plaintiffs point to does not eliminate the need for individualized inquiry into the job duties of each Plaintiff.

Plaintiffs also argue that they are similarly situated because they all had the same job training, were paid under the same compensation plan, and were subject to the same supervision structure. (Instrument No. 92 at 18-20). However, Plaintiffs do not explain how any of these factors indicate that Plaintiffs are similarly situated as to the key issue in this case: whether RAMs and GAMs were properly classified as exempt. For example, although Plaintiffs may have undergone the same training, uniform training did not lead to uniform job duties because Plaintiffs have testified to a wide variety of tasks and hours. Similarly, although all RAMs and GAMs reported to a Regional Sales Manager, who in turn reported to the national executive team, Plaintiffs do not explain how this indicates that their work experiences were the same. In fact, Named Plaintiffs have alleged that management put the Houston office alone on "lock down" while they worked there, meaning that they could not leave the office at all. *See* (Instrument No. 86-7 at 4-6; Instrument No. 86-8 at 9). There are no allegations that other managers placed their sales team on "lock down." Opt-In Plaintiffs have also testified to a wide range of sales activities and quotas, which varied from office to office and even within the same office. *See* (Instrument No. 86-19 through 86-50, interrogatory answer #15). Plaintiffs cannot show that similar compensation, training, and supervision plans makes them similarly situated. *Cf. Kuntsmann v. Aaron Rents, Inc.*, 2:08-CV01969-KOB, 2013 WL 245958 *3 (N.D. Ala. Jan. 23, 2013) (denying decertification where the compensation scheme, training, job description, and job manual *created* "overarching similarities in fundamental aspects of the managers' jobs and responsibilities").

Additionally, the *Tracy* court held that similar job descriptions, training, duties, and compensation were insufficient for plaintiffs to proceed as a class because the employees "had broad discretion to decide how to allocate their time—as borne out by the appreciable variations in the time spent on sales activities outside of the office by the" opt-in plaintiffs. *Tracy*, 293 F.R.D. at 399. The evidence in this case similarly indicates that Cogent provided RAMs and GAMs the discretion to determine the amount of time they spent on outside and inside sales activities. (Instrument No. 86-2 at 5; Instrument No. 86-3 at 26, 28). Therefore, the fact that the same compensation plan, supervision structure, and training apply to all RAMs and GAMs is insufficient to demonstrate that Plaintiffs are similarly situated.

The Court finds that, due to the variation in the amount of time that Opt-In Plaintiffs spent on outside sales, determining whether each Plaintiff is exempt under the outside sales exemption would require dozens of mini-trials. A jury would have to determine whether each Plaintiff spent a sufficient amount of time on outside sales, and whether those sales were sufficiently indispensable components of their sales efforts. Based on Plaintiffs' varied testimony, it would be impossible for the jury to make a blanket determination concerning the FLSA exempt status of the entire class of Plaintiffs. Therefore, the disparate factual and employment settings of Plaintiffs weigh against continued certification.

## C.

The second decertification factor looks to whether the defendant has defenses available that appear to be individual to the various plaintiffs. *Johnson v. TGF Precision Haircutters, Inc.*, CIV.A. H-03-3641, 2005 WL 1994286 *5 (S.D. Tex. Aug. 17, 2005). Defendant argues that its defenses are too individualized as to each Plaintiff for this case to proceed as a collective action. (Instrument No. 86 at 22). Defendant identifies two primary defenses to Plaintiffs' claims: that

Defendant properly classified its RAMs and GAMs as exempt; and that Plaintiffs' claims as to both liability and damages are not credible. Plaintiff argues in response that Defendant's defenses are not individual to each Plaintiff because Defendant maintains a central policy that binds the class members together: the decision to classify RAMs and GAMs as exempt. (Instrument No. 92 at 23-24). Plaintiff claims that it is hypocritical for Defendant to argue that the Court cannot make a collective decision regarding misclassification where Defendant made a collective decision to classify all RAMs and GAMs as exempt. (Instrument No. 92 at 23).

Defendant's first defense is that it properly classified its RAMs and GAMs as exempt under the outside sales, administrative, and/or highly compensated exemptions. The Court will only consider the outside sales exemption here because, although Defendant mentions the administrative and highly compensated exemptions briefly, it has not cited any evidence indicating that either of the latter two exemptions is potentially applicable to the facts of this case. *See* (Instrument No. 86 at 12-13, 22). For example, Defendant provides no information about how many Plaintiffs might be subject to the administrative or highly compensated exemptions, or why. The Court therefore has insufficient information to determine whether the latter two exemptions introduce defenses that are individual to the various plaintiffs. Nevertheless, for the reasons discussed above, the outside sales exemption alone would require highly individualized fact-finding. *See Johnson*, 2005 WL 1994286 at *6 ("In one sense the [exemption alleged] pertains to the opt-in class as a whole, because Defendants assert it broadly. Functionally, however, [the exemption] is in fact a highly individualized defense because its application requires week-by-week and other periodic calculations (e.g., not less than monthly on one part of the formula) specific to each individual Plaintiff and his or her particular circumstances."). The outside sales exemption is a highly individualized defense because its

application will require the jury to determine how many hours per week each individual Plaintiff worked outside the office and how important that work was.

Plaintiffs respond that "a factual nexus which binds [Plaintiffs] together as victims of an alleged policy or practice" is sufficient for the Court to conclude that Plaintiffs are similarly situated. (Instrument No. 96 at 4) (quoting *Thiebes v. Wal-Mart Stores, Inc.*, CIV. 98-802-KI, 1999 WL 1081357 *2 (D. Or. Dec. 1, 1999) and *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 535 (S.D. Tex. 2008)). However, in *Thiebes*, the court found that the plaintiffs were similarly situated for the purposes of certification, which is undeniably a lower standard than at the decertification stage, and the court specifically noted that it might later decertify the class once discovery had been conducted. *Thiebes*, 1999 WL 1081357 at *3. Furthermore, the plaintiffs in *Thiebes* alleged a storewide policy that "create[d] an atmosphere in which working off the clock is essentially mandatory," and that this violation allegedly applied "to all hourly workers" employed by the defendant. *Id.* at 2. The pre-discovery facts of *Thiebes* therefore suggest that if the defendant did violate the FLSA as to one plaintiff, it would have violated the FLSA as to all class members. In this case, however, as discussed above, an individualized fact-intensive inquiry is necessary to determine if Defendant violated the FLSA as to each individual Plaintiff. Additionally, in *Falcon*, the court merely noted that, at a minimum, "there must be meaningful identifiable facts or legal nexus [that] bind the claims." *Falcon*, 580 F. Supp. 2d at 535 (internal quotations and citing references omitted). In denying the motion to decertify, the court identified significant evidence supporting the conclusion that the plaintiffs were similarly situated, leading the court to conclude that the identified "defenses are not so individualized that they cannot be addressed by representative testimony." *Id.* at 535-38. This Court has reached the opposite conclusion, leaving Plaintiffs with *only* their argument that they are affected by Defendant's

single decision, policy, or plan to classify them as exempt. *See* (Instrument No. 92 at 22-23). Because the correctness of this single decision must be analyzed separately as to each individual Plaintiff, Defendant's group-wide classification of Plaintiffs as exempt does not demonstrate that Plaintiffs are similarly situated. *See Johnson*, 2005 WL 1994286 at *6 (holding that the claimed exemption, although asserted broadly, is "in fact a highly individualized defense" because it necessitates individualized factual findings).

Defendant also argues that it intends to impeach the credibility of each Plaintiff regarding sales activities, job duties, and overtime hours asserted. (Instrument No. 86 at 23-24). Defendant argues that such questioning will require individual questioning of each Plaintiff at trial, such that representative testimony about duties, sales, and hours worked is impossible. The Court finds that Defendant's outside sales exemption defense is sufficient to show that defenses in this case appear to be individual to each Plaintiff. Therefore, the Court does not address this issue.

Therefore, the Court finds that the individualized defense asserted for each Opt-In Plaintiff weighs against continued certification.

## D.

The final factor "direct[s] the court to consider the primary objectives of the FLSA collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity." *Reyes v. Texas Ezpawn, L.P.*, CIV.A. V-03-128, 2007 WL 101808 *6 (S.D. Tex. Jan. 8, 2007) (citing *Hoffman–LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). "The court must also consider whether it can coherently manage the class in a manner that will not prejudice any party or be particularly burdensome on a jury." *Reyes*, CIV.A. 2007 WL 101808 at *6.

Plaintiffs argue that certification of the class will further judicial economy through pooling of resources and efficiently resolving common issues of law and fact arising from the same activity. (Instrument No. 92 at 24). However, in light of the individual analysis each Plaintiff's claim will require, "the judicial inefficiency of having essentially [dozens of] mini-trials clearly outweighs any potential benefits in proceeding as a collective action." *Id.* at *6. Plaintiffs' claims are not amenable to generalized evidence because the "individualized claims and individualized defenses, all of which are highly fact intensive, would not only dominate but would swallow and consume the entire case." *Johnson*, 2005 WL 1994286 at *7. Although there are undeniably some common issues of law and fact present in this case, the ultimate issue of whether Plaintiffs were properly classified must be determined on an individual basis. Therefore, fairness and procedural considerations weigh against continued certification.

Additionally, the Court notes that, considering the disparities in Plaintiffs' testimony regarding outside work, Defendant may have improperly classified some Plaintiffs and properly classified other Plaintiffs. This suggests that decertification is necessary, because representative testimony could never truly be representative. If the jury found "in [P]laintiffs' favor, it would have to do so on the basis of proof that is not representative of the whole class, and the verdict would result in liability on [D]efendant in a magnitude that is not likely to be warranted in reality." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 588 (E.D. La. 2008). Conversely, if the jury found "that on the whole [Defendant] proved its defense, then all of [P]laintiffs' claims would be extinguished," although some claims might have merit if considered individually. The only way to eliminate this possibility is to have multiple mini-trials so that the jury could determine the merits of applying the outside sales exemption to each individual

Plaintiff. Because large numbers of mini-trials would prove unworkable, the potential for bias on both sides warrants decertification.

Plaintiffs argue that the Court could rely on representative testimony to make trial manageable. (Instrument No. 92 at 25-26). However, they have identified no feasible plan for determining which Plaintiffs' testimony would be deemed representative. This is particularly problematic here, where some Plaintiffs may qualify for the exemption and others may not, and where that line may be drawn is entirely an issue of fact. *Johnson*, 561 F. Supp. 2d at 588. Although representative testimony may be workable and even necessary in a case where Plaintiffs are truly similarly situated, Plaintiffs have not established that proceeding as a class is appropriate here.

Plaintiffs' proposals for bifurcation and subclasses of RAMs and GAMs are similarly unworkable. (Instrument No. 92 at 26). Bifurcating the trial into a liability stage and a damages stage may have been appropriate if liability could be established with representative testimony. However, as already discussed, whether the exemption applies to Plaintiffs can only be established on an individual basis. Additionally, the only subclasses Plaintiffs identify are RAMs and GAMs. (Instrument No. 92 at 26). However, Plaintiffs' interrogatory answers indicate that classes of RAMs and classes of GAMs would not be similarly situated either. For example, in a sample of three GAMs, one never worked outside the office, one worked outside the office one hour per week, and one worked outside the office eight hours per week. *See* (Instrument Nos. 86-21; 86-36, 86-30). Four RAMs respectively report never working outside the office and working outside the office three hours, six hours, and eight to nine hours per week. *See* (Instrument Nos. 86-48; 86-46, 86-47, 86-24). The subclasses Plaintiffs have identified would not eliminate the need for mini-trials.

Therefore, the Court finds that fairness and procedural concerns weigh against continued certification.

## E.

In considering the three-part test identified in *Mooney*, the Court finds that all three factors support decertification. *See Mooney*, 54 F.3d at 1213 n.7. Accordingly, Defendant's Motion to Decertify the Collective Action is GRANTED. This action will proceed solely on behalf of Named Plaintiffs, Ramon Lagos, Michelle Sparrow, and Carla Obasuyi.

## III.

## A.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25(1986)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence

of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (*quoting Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *Chevron Phillips*, 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas,* 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## B.

Defendant has moved for partial summary judgment on overtime wages sought for the time period prior to two years before the filing of this suit. (Instrument No. 85). Defendant argues that the Court should apply a two-year statute of limitations in this lawsuit because Defendant's purported violations were not willful as a matter of law. Plaintiffs respond that issues of material fact remain surrounding willfulness because Defendant was on notice that Plaintiffs were working more than forty hours per week, Defendant was aware of the requirements of the FLSA, and Defendant was aware that its sales practices differed from the industry standard for outside sales positions. (Instrument No. 91).

Although Defendant also seeks a ruling that 3-Year Opt-In Plaintiffs' claims are time-barred, the Court has now granted Defendant's motion to decertify the collective action, and only

Named Plaintiffs' claims remain in this lawsuit. Therefore, the Court need only determine whether a two-year statute of limitations is appropriate in this case.

FLSA overtime claims are subject to a two-year statute of limitations for ordinary violations and a three-year period for willful violations. 29 U.S.C. § 255(a). "A cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halfert v. Pulse Drug Co.*, 821 F.2d 261, 271 (5th Cir. 1987). Thus, while FLSA overtime claims are continuing violations, employees are permitted to seek wages only for the statute of limitations period, not for related violations that took place prior. *Hendrix v. Yazoo City*, 911 F.2d 1102, 1103 (5th Cir. 1990). An employer's violation is "willful" and, therefore, subject to the three-year statute of limitations period under the FLSA if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The plaintiff bears the burden of establishing willful conduct by his or her employer. *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990).

In *McLaughlin*, the Supreme Court was clear that "willfulness" does not mean simply knowledge that the FLSA exists. *McLaughlin*, 486 U.S. at 132-33. Rather, Congress clearly "intended to draw a significant distinction between ordinary violations and willful violations." *Id.* Willfulness has been found where the plaintiff establishes that the employer actually knew it was violating the FLSA or was on notice that its practices violated the FLSA. *See Singer v. City of Waco*, 324 F.3d 813, 821-22 (5th Cir. 2003) (upholding jury finding of wilfulness where employer's attorney advised employer not to investigate despite knowledge that employees were being paid incorrectly); *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (upholding district court's finding of willfulness where the employer continued practices that had been deemed

violations of the FLSA after notice by the Department of Labor). Conduct that is merely negligent or unreasonable, however, does not rise to the level of a "willful" violation. *See Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990). While willfulness is typically a question of fact for the jury, where the plaintiff introduces no evidence sufficient to support a finding of willfulness, summary judgment in favor of the defendant is appropriate. *Ikossi-Anastasiou v. Bd. of Supervisors of Louisiana State Univ.*, 579 F.3d 546, 553 (5th Cir. 2009).

First, the Court must determine whether it is appropriate to consider Plaintiff's sur-reply. Defendant has filed a motion to strike the sur-reply, (Instrument No. 97 at 3), arguing that the sur-reply is improper because Plaintiffs expand upon arguments made in their response, as opposed to addressing new arguments and evidence contained in the reply. Defendant further complains that Plaintiffs have improperly filed five new declarations in the sur-reply, to which Defendant had no opportunity to respond. Third, Defendant argues that the new declarations contain objectionable evidence. The new declarations attached to Plaintiff's sur-reply address only allegations that employees complained to management about the hours they worked over forty per week. *See* (Instrument No. 95-1 to 95-5). Whether employees complained about the number of hours they worked is irrelevant to the question of whether Defendant may have willfully *misclassified* RAMs and GAMs as exempt. *See, e.g., Edwards v. Alta Colleges, Inc.*, CIV. SA-03-CA-0538, 2005 WL 578333 (W.D. Tex. Jan. 28, 2005) (noting that the plaintiffs' claim that they were promised a forty-hour work week but required to work more was no evidence that the defendant may have recklessly or intentionally misclassified them). Plaintiff's entire sur-reply is devoted to "providing additional evidence to further support their case on" the issue of willfulness. *See* (Instrument No. 95 at 1-3). However, this additional evidence is irrelevant to establishing a material issue of fact on willfulness. Therefore, because the Court

does not rely on the new declarations attached to the sur-reply, Defendant's motion to strike the sur-reply is DENIED as moot.

However, Plaintiffs have introduced evidence in their response that management was aware that Cogent's sales practices differed from the industry standard regarding outside sales. For example, Cogent's Director of Sales, Fitz Anderson, testified that Cogent had success with conducting sales over the phone but that he was not exposed to that sales method at other companies, where he conducted face-to-face outside sales. (Instrument No. 91-2 at 22-24). Named Plaintiff Lagos testified that, based on his position and sales activities at Cogent, which were "very different" from his experience conducting outside sales activities with other employers, he told his manager that he felt his position was not exempt. (Instrument No. 91-5 at 8). Lagos testified that he and his manager "discussed . . . the duties and the way that this [job] is set up and that this is not like similar to other sales positions that I have performed before, because this is more like a, you know, telemarketing position, staying in the office all the time. So it is not an outside sales or traditional sales position." (Instrument No. 91-5 at 9). Unlike in *Ikossi-Anastasiou v. Bd. of Supervisors of Louisiana State Univ.*, 579 F.3d 546, 553 (5th Cir. 2009), where the Fifth Circuit noted there was no evidence that the defendant "ignored or failed to investigate [the plaintiff's] complaints," here there is some evidence that Defendant was aware its sales practice differed from other companies and that at least one Plaintiff complained about his classification as exempt based on the differing sales practice. The Court finds that this evidence is sufficient to preclude summary judgment for Defendant on the issue of willfulness.

Accordingly, Defendant's Motion for Partial Summary Judgment on statute of limitations grounds is DENIED. (Instrument No. 85). Defendant's Motion to Strike Plaintiff's Sur-Reply is DENIED as moot. (Instrument No. 97).

## IV.

Finally, Defendant has moved to compel arbitration for Arbitration Opt-In Plaintiffs, strike Late Opt-In Plaintiffs' Notices of Consent, and dismiss Noncompliant Opt-In Plaintiffs. (Instrument No. 79). Defendant's motion applies only to certain Opt-In Plaintiffs, not to any Named Plaintiff. The Court has already held that the class must be decertified and Opt-In Plaintiffs must be dismissed.

Accordingly, Defendant's Motion to Compel, Motion to Strike, and Motion to Dismiss is DENIED as moot.

## V.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendant's Motion to Compel, Motion to Strike, and Motion to Dismiss is **DENIED as moot**. (**Instrument No. 79**). Additionally, Defendant's Motion for Partial Summary Judgment is **DENIED**. (**Instrument No. 85**). Defendant's Motion to Decertify the Collective Action is **GRANTED**. (**Instrument No. 86**). The claims alleged on behalf of all Opt-In Plaintiffs are DISMISSED without prejudice to refiling in an appropriate court. Defendant's Motion to Strike Plaintiffs' Sur-Reply to the Motion for Partial Summary Judgment is **DENIED as moot**. (**Instrument No. 97**).

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this the ⟍2⁴ʰ⟋ day of March, 2014, at Houston, Texas.

_____
**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**